IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
BUDDY LYNN, et al.,           )
                              )
      Plaintiffs,             )
                              )
      v.                      )   CIVIL ACTION NO.
                              )   2:96cv940-MHT
AMOCO OIL COMPANY, et al.,    )      (WO)
                              )
      Defendants.             )
```

OPINION

This lawsuit is now before the court on the motions

for summary judgment filed by defendants Amoco Oil

Company, BP Exploration & Oil Inc., Texaco Refining and

Marketing Inc., Shell Oil Products Company, Mobil Oil

Corporation, Exxon Corporation, Chevron U.S.A. Inc., and

Chevron USA Products Company, as to count D of the third

amended complaint. In count D, the plaintiffs, who own

property adjacent to or near sites where gasoline has

been stored in underground storage tanks (USTs), allege

that the defendants conspired together to contain their

costs and avoid liability for the prevention, detection,

and clean-up of leaking USTs, in violation of the following underlying state-law torts: fraudulent concealment, trespass, and nuisance. For the reasons below and based on a voluminous record, the motions for summary judgment will be granted as to this claim.


## I.  PROCEDURAL HISTORY

The plaintiffs originally filed this action in the Circuit Court of Coosa County, Alabama. The suit was removed to federal court on grounds of diversity of citizenship. 28 U.S.C. § 1332.[1] The plaintiffs filed an amended complaint, a second amended complaint, and a third amended complaint. The defendants moved to dismiss this action, and the court, adopting the recommendation of the United States Magistrate Judge, denied their motions. Peters v. Amoco Oil, 57 F. Supp.2d 1268 (M.D. Ala. 1999). After a lengthy period of discovery, the

---

1. The parties are in agreement that the court has no basis for jurisdiction other than that conferred by § 1332. Transcript of oral argument, at 9-10.

defendants moved for summary judgment. The court heard extensive oral argument on the defendants' motions.

## II.  SUMMARY-JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "[f]or issues ... on which the

3

non-movant would bear the burden of proof at trial, ...
the moving party [for summary judgment] simply may
show[]--that is, point[] out to the district court--that
there is an absence of evidence to support the non-moving
party's case." Fitzpatrick, 2 F.3d at 1115-16 (citations
and quotation marks omitted).


### III.  FACTUAL BACKGROUND

The facts, construed in a light most favorable to the
plaintiffs, are as follows:  The plaintiffs own property,
in Alabama and Massachusetts, adjacent to or near sites
where gasoline has been stored in USTs.  The defendants
are oil companies doing business throughout the United
States, many of whom owned, operated, leased, or
controlled USTs near the plaintiffs' properties.  The
USTs near the plaintiffs' properties have had confirmed
leaks which already have or imminently will contaminate
the plaintiffs' properties.

The kind of USTs that are the subject of this lawsuit were first installed early in the last century and were extensively used in the 1950s and 1960s. Made of bare steel, they have corroded over time and have developed significant leaks. The leaks, replacement costs, clean-up expenses, and liability for environmental damage has cost hundreds of millions of dollars.

Each of the defendants used bare-steel USTs, although since 1965 corrosion-resistant designs, such as double-walled tanks, fiberglass tanks, and steel tanks with cathodic protection, were available. The defendants also all relied on inadequate methods for detecting leaks. For instance, all of the defendants used various methods of "inventory control"--reconciling the quantity of gasoline put into the USTs with the quantity of gasoline being sold using different techniques for measuring the amount of gasoline in the tanks--to detect leaks. One method that the defendants commonly used to measure quantity was the "stick" method in which a wooden pole

was dipped into USTs to measure gasoline levels. So-called "sticking" tanks is not an accurate method for detecting leaks because, for instance, it fails to account for tank settlement and the different volumes liquids assume at different temperatures.

Confronted with potential liability from leaking USTs, the defendants all adopted strategies to reduce their costs and exposure. This entailed, in part, selling off UST sites that had leaks or were at significant risk of leaking--sometimes for nominal prices--but upgrading tanks at the sites that the defendants chose to keep. When the defendants sold off sites, they did not adequately test them to determine their condition or the likelihood that they would imminently develop leaks. Moreover, none of the defendants devoted what the plaintiffs consider to be adequate resources into researching and developing better tanks or leak detection and control technologies.

Over the period that this lawsuit encompasses, 1970 through the present, the defendants maintained contact and interacted with each other through the American Petroleum Institute (API), which published articles, reported studies, and fostered research into UST issues. API events also provided opportunities for members of the industry to come together to discuss the problem of leaking USTs.

The defendants also closely monitored each other's conduct with regard to UST leaks and tank-upgrade programs. They exchanged information regarding the cost of upgrades and the projected goals of their upgrade policies.

Additionally, the defendants collectively tracked regulatory and legislative attempts to address the problem of leaking USTs. They championed a clean-up method called risk-based corrective action (RBCA), which sought to control the costs of cleaning up the damage

caused by leaks.[2]  They came together in a group called
"partnership in RBCA implementation" (PIRI) to influence
state legislation and regulation that enabled them to
reduce or avoid clean-up costs.  This group also provided
an opportunity for the defendants to exchange information
and discuss questions of mutual concern regarding the
costs of UST clean-up and regulation.

## IV.  DISCUSSION

The heart of this case is the allegation that the
defendants conspired together to contain their costs and
avoid liability for the prevention, detection, and clean-
up of leaking USTs.  As this court understands the
plaintiffs' contentions, there are three basic claims.[3]

---

2.  RBCA, in simple terms, advocates cleaning up
gasoline leaks and spills based on the risk they create.
A consequence of this is that, at least potentially, a
spill of large dimensions that poses no immediate threat
may not receive as much attention as a smaller spill that
creates a greater risk.

3.  The court notes that the plaintiffs, in their
brief in opposition to the defendants' motion for summary
(continued...)

The first is that the defendants were aware that bare-steel USTs had significant leakage problems, and they agreed to divest themselves of their USTs, agreed to delay or inadequately implement UST-upgrade programs, agreed to make misleading statements about the dangers posed by USTs, and agreed to adopt inadequate methods of leak detection. The second claim is that the defendants reached two other conspiratorial agreements. First, they "agreed upon and implemented a set of industry standards, adopted with the consent of all defendants which

---

3.    (...continued)
judgment as to this claim, allege that "there were three basic and overlapping agreements among the defendants." Corrected and substituted plaintiffs' consolidated response in opposition to defendants' motions for summary judgment/summary adjudication (Doc. no. 692) [hereinafter plaintiffs' consolidated response] at 27.    However, instead of identifying three agreements by the defendants, the plaintiffs argument identifies 'phases' of the conspiracy. Id. at 29-30 (discussing "a second phase of the conspiracy" and "the third and last stage of the conspiracy"). The court's understanding of the claims is culled from the plaintiffs' briefs and from the oral argument before the court on the instant motion. In so doing, the court has given the plaintiffs all reasonable benefit of  the doubt as to whether an argument has adequately been raised.

established cheap and inadequate codes of conduct for replacing or upgrading of UST equipment for the detection of leaks."[4]  And, second, the defendants agreed to "make false public statements regarding the scope of the UST crisis and their response, and [agreed] to fail to notify potentially impacted land owners of conditions at individual sites."[5]  The defendants are also alleged to have jointly agreed to upgrade the sites that they chose not to sell to prevent leaks in those locations.  The third claim is that the defendants conspired to act jointly "to enact a remediation scheme, [RBCA], which allowed the oil companies to evade cleaning up leaking underground storage tank sites and remediating the consequences of contamination."[6]

Despite the years of discovery and the filings docketed in this dispute, the case for a conspiracy is

---

4.  Id. at 29.

5.  Id.

6.  Id. at 30-31.

fatally flawed.  The plaintiffs have provided no sufficient explanation supported by evidence why the defendants needed to act together to achieve the aims of the alleged conspiracy.  Taken as a whole, the evidence suggests that the defendants <u>individually</u> became aware of the problem of leaking USTs, and acted in various ways to keep their costs and liability down.  They each may have acted in ways that are ethically and morally questionable, and possibly legally actionable.  However, despite the plaintiffs' contentions, as the court explains below, there is no basis to conclude that their actions, no matter how reprehensible, were more likely than not to have been undertaken <u>jointly</u>.

The plaintiffs and the defendants agree that the law of Alabama and the law of Massachusetts govern the conspiracy allegations.[7]  The plaintiffs concede that they do not have direct evidence of the agreements they allege

---

7.  Transcript of oral argument, at 8-9.

are the basis of their conspiracy claim.[8]  Indeed, as the
Illinois Supreme Court has noted, "A conspiracy is almost
never susceptible to direct proof." McClure v. Owens
Corning Fiberglas Corp., 720 N.E.2d 242, 258 (Ill. 1999).
Instead, the plaintiffs seek to prove the conspiracy with
evidence of the defendants' behavior from which
inferences and "common sense-knowledge of the behavior of
persons in similar circumstances," id., would permit a
reasonable factfinder to conclude that the defendants
conspired as alleged.  That is, they seek to demonstrate
the conspiracy with circumstantial evidence.  See Theater
Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S.
537, 540, 74 S. Ct. 257, 259 (1954).  To show a
conspiracy using circumstantial evidence under both

_____

        8.  Id. at 10-11.  Direct evidence would be evidence
that would require no inference to show that the
defendants acted pursuant to an agreement to injure the
plaintiffs.  See, e.g., In re Citric Acid Litig., 191
F.3d 1090, 1093 (9th Cir. 1999); In re Baby Food
Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999).

Alabama law and Massachusetts law,[9] the plaintiffs analogize to a model from antitrust law: parallel conduct with 'plus factors.'[10] <u>See</u>, <u>e.g.</u>, <u>Coleman v. Cannon Oil Corp.</u>, 849 F. Supp. 1458 (M.D. Ala. 1993). The plaintiffs admit that there is no clear basis in Alabama law for transplanting this antitrust paradigm into other

---

9. The elements of civil conspiracy in Alabama and Massachusetts are as follows: Under Alabama law, (1) concerted action by two or more persons to (2) achieve an unlawful or lawful purpose by unlawful means, (3) with actual knowledge and intent to bring about the purpose. <u>Singleton v. Protective Life Ins. Co.</u>, 857 So.2d 803 (Ala. 2003); <u>Luck v. Primus Automotive Financial Servs.</u>, Inc., 763 So.2d 243, 247 (Ala. 2000). Under Massachusetts law, there are two kinds of civil conspiracies, coercive conspiracies and 'means-ends' conspiracies that correspond to Alabama's cause of action. Coercive conspiracies are shown by (1) defendants acting in unison to (2) have a peculiar power of coercion over a plaintiff that they (3) individually would not have had. <u>Aetna Casualty Sur. Co. v. P & B Auto Body</u>, 43 F.3d 1546, 1563 (1st Cir 1994). 'Means-ends' conspiracies are shown by (1) common design or agreement (2) to do a wrongful act, and (3) proof of some tortious act in furtherance of the conspiracy. <u>Id</u>. at 1564.

10. The court notes that at oral argument the plaintiffs stated that they were exclusively relying on an antitrust paradigm, or framework, to prove their alleged conspiracy. Transcript of oral argument, at 11-12.

civil conspiracy contexts.[11]  Nor does Massachusetts law specifically approve this method of proof.[12] Nevertheless, assuming, for the sake of argument, that such a paradigm is acceptable proof of a conspiratorial agreement in both jurisdictions, the court finds that the plaintiffs have not produced evidence that demonstrates the existence of the conspiracy that they allege.


## A.  Legal Framework:
## Parallel Conduct and Plus Factors

As stated, the plaintiffs seek to show the alleged conspiracy with evidence of the defendants' parallel conduct along with plus factors.  In antitrust cases, to demonstrate such an unlawful agreement, the evidence must show "a unity of purpose, of common design and understanding, or a meeting of minds in an unlawful arrangement."  American Tobacco Co., v. United States,

_____

11. Plaintiffs' consolidated response at 33.

12. At least one other state, Illinois, has used this approach.  McClure, 720 N.E.2d at 258-68.

328 U.S. 781, 810 (1946); see also City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 569 (11th Cir. 1999); Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir. 1991). Courts agree that ambiguous evidence, that is, evidence that is as consistent with conspiratorial behavior as it is with independent conduct is insufficient, as a matter of law, to show a conspiracy. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984); Harcros, 158 F.3d at 569; Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., 998 F.2d 1224, 1242 (3rd Cir. 1993); Coleman, 849 F. Supp. at 1466; McClure, 720 N.E.2d at 259. Thus, a plaintiff seeking to establish the existence of a conspiracy must offer evidence that tends to exclude the possibility that the conduct at issue was independent. Matsushita, 475 U.S. at 586-591; Monsanto, 465 U.S. at 764-767; Harcros, 158 F.3d at 570;

15

<u>Todorov v. DCH Healthcare Auth.</u>, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991).

Courts have often considered this requirement as a protection against the danger in antitrust cases of penalizing legitimate conduct and thereby chilling the very competition that the antitrust laws exist to protect. But the burden also springs from very common-sense concerns about what it means to prove a fact or allegation by a preponderance of the evidence. As the Eleventh Circuit clearly held in <u>Harcros</u>, where the proof for a proposition is in "equipoise," it has not been established by a preponderance of the evidence. <u>Id</u>. at 529. Quite simply put, a "fact that can only be decided by a coin toss has not been proven by a preponderance of the evidence, and cannot be submitted to the jury." <u>James v. Otis Elevator Co.</u>, 854 F.2d 429, 432 n.3 (11th Cir. 1988). This basic concern about the nature of proof and the requirement that a fact be proved by a preponderance of the evidence applies outside the context

of antitrust conspiracies, and certainly applies to the civil conspiracy alleged in the case at bar.

Thus, to establish an agreement, the plaintiffs bear two burdens at summary judgment. They must adduce evidence (1) that establishes the possibility of conspiratorial conduct, and (2) that discounts the possibility of independent conduct. Cf. Fitzpatrick, 2 F.3d at 1115-16 ("For issues ... on which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[]--that is, point[] out to the district court--that there is an absence of evidence to support the non-moving party's case.") (citations and quotation marks omitted).

It is long settled in the Eleventh Circuit and in other jurisdictions that evidence of parallel conduct alone is insufficient to show a conspiratorial agreement.[13]  City of Tuscaloosa v. Harcros Chemicals,

_____

13. Although generally courts have held that parallel conduct is insufficient to prove an agreement in the context of prices in oligopolistic markets, this is
(continued...)

17

_Inc._, 158 F.3d 548, 570 (11th Cir. 1998); _Todorov_, 921 F.2d at 1456 n.30; _see also_ _McClure_, 720 N.E.2d at 259 (noting that a "review of the case law from other jurisdictions" establishes that the "overwhelming weight of authority has refused to accept mere parallel action as [sufficient] proof of conspiracy."). The requirement that a plaintiff provide evidence of plus factors is "to assure that there is a reasonable basis to conclude that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan." _Coleman v. Cannon Oil Co._, 1992 WL 111584, *1 (M.D. Ala. 1992). However, the application of this principle is not mechanical: the alleged plus factors must actually tend to prove the existence of an agreement. "In determining

_____

13. (...continued)
equally applicable here. Each of the defendants is a sophisticated corporate entity operating in a complex regulatory and market environment. The requirement that more than mere parallel conduct be shown as evidence of an antitrust conspiracy recognizes the reality that there will often be pressures in such an environment toward similar solutions on the part of interdependent but independent entities.

18

whether ... plus factors are present, courts must be careful that they are not merely restating a finding of conscious interdependence, which, of course, would not constitute a conspiracy." Id.

With this in mind, the court turns to the parallel conduct that the plaintiffs contend is evidence of agreement among the defendants. The plaintiffs allege nine categories of activity in which they argue that the defendants' behavior was substantially parallel. First, the plaintiffs contend that the defendants all continued to use bare-steel tanks well after they knew that such tanks were susceptible to corrosion and leakage, and that the defendants did not upgrade their existing tanks quickly enough after the problems with such tanks became apparent. Second, the defendants used or encouraged stations selling their gasoline to use inadequate methods to detect leaks, such as measuring inventory loss by dipping a stick in the underground storage tanks to check the level of gas; and the defendants did not use more

19

technologically advanced methods of leak detection. Third, the plaintiffs assert that the defendants failed to use a well-tested and long-standing method of protecting their tanks from corrosion and leakage: cathodic protection.[14] Fourth, the plaintiffs allege that the defendants uniformly failed to use better tank technology, such as the "sti-P3" tank.[15] Fifth, the defendants monitored each other's conduct with regard to UST issues. Sixth, the defendants did not adequately devote resources to the development of safer underground tanks. Seventh, the defendants all divested themselves of tanks that were leaking or had a significant risk of leaking. Eighth, all the defendants failed to notify adjacent or neighboring property owners of leaks or contamination. Finally, the plaintiffs allege that the defendants participated in the PIRI group. Although the

_____

14. As the court understands this, cathodic protection uses a weak electrical charge to protect steel pipelines and tanks from corrosion.

15. Transcript of oral argument at 17.

defendants contest the extent to which their conduct was sufficiently parallel to support a finding of conspiracy, the court will assume, without deciding, that such conduct could be sufficiently parallel.

However, even accepting the plaintiffs' contention that the conduct is parallel, such evidence does not, as stated, suffice to prove a conspiracy. See, e.g., Harcros, 158 F.3d at 570-71. The evidence before the court shows that the defendants were all faced by the problem of leaking USTs. As a logical matter, when competitors are similarly situated and confronted by similar problems, they may independently adopt convergent strategies or solutions.

Accordingly, the court turns to examine those factors that the plaintiffs claim provide the requisite evidence to exclude the possibility that the parallel conduct is not conspiratorial, that is, that it was undertaken independently. First, however, it is necessary to be clear what this evidence must be. As Hovenkamp and

Areeda correctly state, the question of concerted action is not "the abstract question of whether there was any concerted action of any kind," VII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1477 (Aspen 2003), but rather "whether there was a concerted decision" to undertake the specific action alleged to violate the law. Id. Thus the court is not concerned if there is any evidence of concerted conduct or evidence that discounts independent action by the defendants during the period at issue on any issue at all; rather, the evidence must tend to show the agreements the plaintiffs have alleged or to exclude the possibility of independent action regarding those agreements.[16]

---

16. The court gives the following by way of illustration. Hypothetically, the defendants at a particular industry meeting may all have agreed to pool losses and profits from UST leaks among themselves so as to minimize their collective tax liability in violation of the Internal Revenue Code. Evidence of such an agreement, however, would not tend to show that the defendants conspired with regard to the different UST issues that form the basis of the plaintiffs' contentions in this suit.

In their briefs and argument, the plaintiffs identify the following plus factors: acts against economic interest, repeated meetings between employees and executives of the defendants, exchanges of information, and acts taken in furtherance of the adoption of industry, legislative, and regulatory standards.[17] As the court explains in detail below, the plaintiffs have not met their burden of producing evidence to show that the plus factors they have raised permit any inference that the defendants reached the agreements the plaintiffs allege.[18]

---

17. The court notes that the plaintiffs have nowhere clearly set out an exhaustive list of plus factors in their filings on summary judgment, nor did they do so at oral argument, despite their statement that the antitrust paradigm was the one on which they were relying. However, after close consideration of the briefs, argument, and evidence, the court concludes that these are the plus factors that have been presented. The court has compiled this list, giving the plaintiffs all benefit of the doubt as to whether a particular factor has been raised and argued.

18. Indeed, the principal difficulty this court has had in resolving the pending summary-judgment motions is that the evidentiary record submitted by the plaintiffs

(continued...)

### i.  Acts Against Interest

The plaintiffs argue that the evidence reveals no economic reason for the defendants' conduct other than the conspiracy the plaintiffs allege.  Evidence that litigants have acted against what can fairly be shown to be in their own individual economic interest as opposed to their interest acting collectively can provide proof of an agreement.  See <u>Amey, Inc. v. Gulf Abstract &</u>

---

18. (...continued)
is organized more to rebut the arguments made in support of the defendants' motions for summary judgment than to demonstrate the existence of disputed material facts regarding those issues on which the plaintiffs bear the burden of proof at trial.  See <u>Fitzpatrick</u>, 2 F.3d at 1115-16 ("For issues ... on which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[]--that is, point[] out to the district court--that there is an absence of evidence to support the non-moving party's case.") (citations and quotation marks omitted).  Such organization has made the court's task of determining whether there is evidence in support of the plaintiffs' alleged conspiracy unnecessarily onerous.  Nevertheless, the court's conclusions regarding the adequacy or inadequacy of the evidentiary record for the purposes of summary judgment are based on review of all the evidence presented.

Title, Inc., 758 F.2d 1486, 1504-05 (11th Cir. 1985); VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1434c (Aspen 2003). However, in this instance, although the plaintiffs raise this argument, they have offered no economic, business-organizational, sociological, game-theoretic, mathematical, or historical evidence to support their allegation. The only economic evidence in this case has been offered by the defendants in the form of the economic reports of Professor David J. Teece.

Of course such expert evidence from the plaintiffs might not be necessary if the report by Professor Teece or the other evidence in the record supported the plaintiffs' position. However, Professor Teece's report does not support the plaintiffs' contentions in any way; nor does the other evidence provide a basis to conclude that the actions any defendant took were actions against its individual self-interest.[19] Only one document that

_____

19. Plaintiffs' exhibits 52, 53, 57, 69, 113, 114,
(continued...)

25

the plaintiffs contends illuminates the economic incentives of the defendants discusses the interests of the defendants vis-à-vis each other and vis-à-vis other segments of the petroleum industry on the issue of USTs. That is a Texaco memorandum dated July 5, 1989.[20]

The Texaco memorandum was written against the background of state efforts to enact legislation to create UST clean-up funds, to require UST owners to assume financial responsibility for leaks, and to impose a single deadline for assuring that all UST owners had adequate insurance against leaks and contamination.[21]  The memorandum notes that Texaco and API have shared the position that "underground storage tank insurance requirements should be applied to all owners at the same time."[22]  However, the memorandum argues this common

---

19. (...continued)
115, 116, 121, 216, 434.

20. Plaintiffs' exhibit 120.

21. Id. (memorandum dated November 8, 1989, at 1)

22. Id.

position should be reconsidered because of the difficulties that Texaco's "jobbers"--independent middle-men or retailers--were encountering in obtaining insurance to cover their potential financial exposure for UST sites.[23] Texaco, the memorandum argued, was better able to afford the costs of insurance because the company was self-insuring, but its jobbers, who needed to purchase coverage, were not. Because Texaco's "Major competitors, i.e., Arco, Shell, Amoco" were less reliant on jobbers to sell their products, they "would be less effected [sic] should this class of trade suffer financial difficulty."[24] The memorandum indicated that it was vital that Texaco maintain its alliances with the Petroleum Marketers Association of America and with the Society of Independent Gasoline Marketers of America. And the document concluded:

---

23. Transcript of oral argument at 21, 327-29.

24. Plaintiffs' exhibit 120 (memorandum dated November 8, 1989, at 3)

27

> "A self serving approach on the UST
> issue could destroy this alliance, and
> if so, work in the interest of those
> seeking PMPA amendments. ... [I]t may
> not always be desireable or in Texaco's
> best interest to maintain the position
> opposing exceptions from environmental
> requirements for small firms in all
> situations. ... [T]here will be no
> competitive disadvantage facing the
> large refiner/marketer by legislatively
> allowing EPA to extend the compliance
> deadlines for the smaller UST owners to
> meet the financial responsibility
> requirements."[25]

This evidence indicates that Texaco may have subordinated its interests to those of other oil companies: the smaller jobbers. But a conspiracy involving smaller jobbers is not alleged here. Instead, the plaintiffs allege a conspiracy involving an agreement between Texaco, Amoco, BP, Shell, Mobil, Exxon, and Chevron. The memorandum provides no support for the contention that Texaco, on the UST issues raised by the plaintiffs, conspired with the other defendants in this suit.

_____

25. _Id_.

28

The burden lies, as stated, on the plaintiffs to establish the elements of their affirmative case. There is simply no basis for this court (which is not expert in the economics or organizational behavior of the highly complex oil industry) on the evidence submitted to conclude that the plaintiffs' arguments about economic interest are correct; nor could such an inference be drawn by any reasonable factfinder.

In the absence of evidence to support the plaintiffs' allegation that the defendants acted against their individual interests in furtherance of the alleged conspiracy, the court must conclude that this plus factor has not been established.[26]

------

26. The fact that the plaintiffs have not established this plus factor is of great concern. As the court stated at oral argument:

> "I guess what I'm trying to separate out in looking at this parallel conduct is, you know, let's say the president of AMOCO and the president of EXXON met in this room and said we've got tanks out there that are leaking. I'm getting rid of mine. You know, I don't want those
>
> (continued...)

---

26. (...continued)

things. They're going to be an environmental nightmare. And the president of the other company says the same thing and they walk out of the room and both of them get rid of them. I don't necessarily think that's an agreement. That's just where they're just saying -- they're just acting in their interests, just happening to say what they're going to do, versus where the two companies actually have an agreement to do something. In fact, they don't even need an agreement to do this. They don't need an agreement to say we're going to get rid of these tanks. Which actually maybe raises another question. Why would they even need an agreement to do what you're claiming they have done? What's the purpose of having an agreement? I can see trying to get around an agreement to raise prices, but where is there even a need to do an agreement here if they just want to get rid of tanks? It may be that it's bad, it may that they don't want to have these things on hand any more, but what's the purpose of the agreement other than maybe they're just exchanging information?"

Transcript of oral argument, at 160-61. Thus, the failure to present evidence to establish this plus factor is, in large measure, a failure to explain the underlying need for agreement to achieve what the plaintiffs allege has injured them.

## ii.  Meetings

The second possible plus factor the plaintiffs raise is that employees and executives of the defendants met and discussed UST leak issues and other related matters primarily through the American Petroleum Institute (API) and through the Environmental Protection Agency-initiated group, PIRI.   The plaintiffs also argue that the defendants' employees and executives met at social events in conjunction with API meetings and in private, industry only-meetings in connection with PIRI.[27]

There is little doubt that meetings under the umbrella of industry and trade associations or on the periphery of such organizations may provide an opportunity for reaching conspiratorial agreements.  See, e.g., Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975)

_____

27. With regard to this plus factor, the plaintiffs have not explained why meetings among employees and executives can fairly be considered a plus factor.  Of course, at summary judgment the question is not whether the non-moving party has presented a theory to explain why its evidence is sufficient to survive summary judgment, but whether the evidence itself is sufficient.

31

(price fixing); <u>Fashion Originators Guild of America, Inc. v. FTC</u>, 312 U.S. 457 (1941) (group boycott); <u>Alvord-Polk, Inc. v. F. Schumacher & Co.</u>, 37 F.3d 996 (3rd Cir. 1994). However, it is equally clear that participation in an industry association itself does not automatically support a finding of a conspiratorial agreement. <u>See, e.g.</u>, <u>In re Citric Acid Litig.</u>, 191 F.3d 1090, 1098 (9th Cir. 1999); <u>see also</u> <u>Maple Flooring Mfrs Ass'n v. United States</u>, 268 U.S. 563, 567 (1925). There must be something additional, such as a lack of a plausible explanation for the meetings or evidence of furtiveness and an indication that the furtiveness is not "innocent stealth," VI Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u>, ¶ 1417d (Aspen 2003), to permit the inference that meetings are evidence of conspiracy. Thus, the question is whether any evidence supports the conclusion that the defendants reached an agreement or acted jointly with regard to the conspiracy that the plaintiffs have alleged. It does not.

With regard to API meetings, the plaintiffs have offered evidence that there were regular high-level meetings among the corporate officers of the defendants through the API, especially through its committee on public information and emerging issues task force.  A thorough, exhaustive review of the evidence of API activity reveals these meetings were the usual and routine meetings of API and its committees.  Although UST issues were the subject of API activity, the evidence presented does not reveal any attempts to reach agreement to coordinate selling service stations or USTs, to coordinate upgrading USTs, or to coordinate public statements on UST issues.  To the extent that the plaintiffs contend that the evidence shows anything more than the routine, normal, and legal operations of a trade organization, the court is unable to discern it.[28]

_____

28. For instance, there is no indication that UST issues played a greater role in these meetings than one might otherwise expect or that the treatment of UST issues in the meetings for which the plaintiffs have provided evidence was different from the usual practice (continued...)

Equally crucially, the evidence does not indicate that the defendants' activities through API regarding UST issues were either in the defendants' individual or their joint interest. The evidence is simply not probative of the issue of joint versus individual interest. Although the record is extensive, it does not provide evidence to support the conclusion that the defendants agreed to act jointly as the plaintiffs contend.

Next, the court considers whether meetings in connection with PIRI constitute a plus factor. The court will assume, without deciding, that implementing RBCA schemes permitted the defendants individually to reduce the cost of cleaning up UST leaks. But the plaintiffs do not contend that "participation in PIRI, in and of

_____

28. (...continued)
of the API. Indeed, there is nothing to indicate that there was anything unusual about the meetings in question or that they formed the basis for any agreements that might explain the allegedly parallel conduct of the defendants.

itself, is actionable."[29]  Instead, the plaintiffs contend that meetings in connection with PIRI were held in secret and permitted the defendants to reach agreements on the issues that define the alleged conspiracy.[30]  Chiefly, the plaintiffs contend that these meetings provided the defendants an "opportunity to conspire"[31] to avoid responsibility for leaks, allocate insufficient resources, and undertake insufficient efforts to clean up contaminated properties.

Nothing in the record that the plaintiffs have submitted reasonably supports the inference that the defendants used these meetings to reach the alleged agreements.  First, the evidence is not probative of the parts of the alleged conspiracy that temporally preceded the formation of PIRI and the conception of RBCA, which the plaintiffs contend began in the late 1980s and early

_____

29. Plaintiffs' consolidated response (Doc. no. 692) at 53.

30. Id.

31. Id. (emphasis in original).

35

1990s.[32]   It would be illogical to think that meetings
that took place after an event enabled the defendants to
conspire to cause that event.[33]   And the allegation that,
if there were opportunities after the event, there may
have been opportunities before it, is simply speculation.
Second, to the extent that these meetings may have
permitted the defendants to reach agreements about RBCA
or its implementation, as explained below, such activity
is shielded from being the basis of liability by the
First Amendment.   And, third, there is no per se rule
against secret meetings.   A "secret" meeting is no
indication of a conspiracy if the stealth that cloaks it
is innocent.   In an analogous antitrust context, an
"example of innocent stealth would be a hidden meeting to
plan lawful lobbying, research, advertising, or joint

---

32. Id. at 30-31.

33. It is possible that a subsequent event may
produce evidence of how a prior incident or pattern
occurred.  None of the evidence of subsequent meetings in
the instant litigation, however, indicates that the prior
alleged parallel conduct by the defendants was the result
of concerted action.

36

ventures." VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1417 (Aspen 2003). As is clear, if simple secrecy or furtiveness raised an inference of conspiracy, "virtually any non-public element could bootstrap any inter-firm contact to a jury." Id. At most, the meetings provided an opportunity, possibly, to conspire, but they do not show that that opportunity was used. Binding Eleventh Circuit precedent is clear that the mere opportunity to conspire will not support a finding of an agreement absent other support. Todorov, 921 F.2d at 1456.

As regards the informal social meetings that the plaintiffs maintain are evidence of a plus factor, none of the evidence supports the plaintiffs' contention. Such meetings, the plaintiffs allege, took place informally, as social gatherings in the penumbra of API and PIRI meetings.[34] The plaintiffs have offered no evidence other than that the defendants may have

_____

34. Plaintiffs' exhibits 245, 292.

discussed UST issues in such settings.  Insofar as these meetings simply provided an opportunity to conspire, absent more probative evidence, they will not support the existence of an conspiracy.  And again, to the extent that such meetings involved issues related to RBCA or PIRI, as explained below, no liability may be imposed because of First Amendment protections.  Finally, the fact that such meetings took place in the penumbra of meetings that do not give rise to any inference of conspiracy in this case, does not, on this record, permit the inference of conspiracy.

### iii.  Communication and Exchange of Information

The next plus-factor evidence that the plaintiffs contend shows the existence of a conspiracy is that the defendants exchanged information regarding their response to the problem of leaking USTs.[35]  The plaintiffs have not provided any explanation for why exchanges of information

---

35. Plaintiffs' response at 42

are inconsistent with independent rather than collusive behavior of the defendants in this case. In the most straightforward antitrust price-fixing conspiracy, evidence of parallel conduct would indicate that competitors' prices were identical; if there were evidence that the competitors exchanged the prices they intended to set, such evidence of exchanged information could show a conspiracy. See generally Stephen Jay Photographs, Ltd. v. Olan Mills, 713 F. Supp. 937 (E.D. Va. 1989), aff'd, 903 F. 2d 988 (4th Cir. 1990). Of course, whether an exchange of information gives rise to an inference of illegal agreement depends on the nature of the exchange and the agreement that is alleged. Id. The plaintiffs have not explained why the exchanges of information in this case might make the possibility of the conspiracy they allege more probable than not, and the court is at a loss to understand how the exchanges of which there is evidence are a plus factor.

There is evidence that the defendants knew, among other things, each other's costs for replacing USTs, how quickly other defendants were implementing tank replacement programs, and what sorts of protections the defendants used.[36]    There is also evidence that the defendants possessed information about their competitors' positions regarding legislation and administrative action that affected, or potentially affected, USTs.[37]  But there is no indication that this was in furtherance of any conspiratorial agreements.

Many of these exchanges occurred through the API, a trade organization, and although the medium of such

_____

36. Plaintiffs' exhibits 113, 120, 246, 292, 293, 298, 300, 301, 301, 302, 303, 400, 405, 415, 416, 429, 431, 438, 448.

37. For instance, plaintiffs' exhibit 113, a letter dated December 12, 1983, from a Texaco employee, indicates that in response to a request for information regarding "competitors progress toward replacing steel underground [petroleum] product storage tanks at retail facilities," the author relied on "contact with ten companies," including Exxon, Shell, Amoco, Chevron, Getty, Gulf, Mibol, Phillips, Sohio, and Union. See also Plaintiffs' exhibits 112, 115, .

exchanges does not shield them from liability, nor does it mandate that they be evidence of conspiracy. In this case there is no indication that such exchanges were regular, mandated, or ongoing, instead of occasional, sporadic, and less than systematic. Although exchanges of information on UST issues among the defendants might have facilitated reaching agreements to act in concert as the plaintiffs have alleged, it does not, itself, imply "mutual assurances to use the information involved in any particular way." VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1422b (Aspen 2003). There is no indication that such exchanges provided an enforcement mechanism for any conspiratorial agreement or that particular instances of parallel conduct may proximately be linked to the exchanges. On the facts presented, the fact that the defendants exchanged information does not suffice to indicate the conspiracy that the plaintiffs have alleged.

### iv.  Participation in the Creation of Industry, Legislative and Regulatory Standards

The final plus factor that the plaintiffs arguably can be said to have raised is that the defendants acted jointly to develop industry standards and to lobby for the enactment of state and federal legislation and regulation affecting UST issues.  The defendants have hotly contested this argument and have urged the court to find such activities to be conduct that cannot be the basis of civil liability under the Noerr-Pennington doctrine.  E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).  "The Noerr-Pennington doctrine insulates from antitrust challenge competitors' decision to combine to petition the government, even if their underlying intention is to restrain competition or gain advantage over competitors." Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 817 (D.C. Cir. 2001).  This doctrine, as courts agree, is rooted in the First Amendment's protection of

the right to petition the government. <u>Andrx</u>
<u>Pharmaceuticals, Inc. v. Elan Corp., PLC</u>, 421 F.3d 1227,
1233 (11th Cir. 2005).

If an activity is a "concerted effort to influence
public officials regardless of intent or purpose,"
<u>Pennington</u>, 381 U.S. at 670, the activity is shielded
from antitrust liability. The principle applies
regardless of whether the government officials who are
lobbied are at the local, state, or federal level. <u>See</u>
<u>TEC Cogeneration, Inc. v. Florida Power & Light Co.</u>, 76
F.3d 1560, 1571 (11th Cir. 1996). Even collective action
that is incidental to a valid effort to influence public
officials is shielded. <u>Id</u>. at 1572. However, where
activities are essentially commercial in nature, and
their political aspects are secondary, liability may lie.
<u>Id</u>.

Although the <u>Noerr-Pennington</u> doctrine applies to
antitrust conspiracies, the principles of law on which it
is based are not restricted to the field of antitrust.

43

The First Amendment prohibits government from penalizing petitioning activity. U.S. Const. amend. I. The <u>Noerr-Pennington</u> doctrine enforces that protection and precludes the antitrust laws from penalizing petitioning activity that is protected under the First Amendment. <u>TEC Cogeneration</u>, 76 F.3d at 1571 ("allowing such conduct to establish Sherman Act liability might substantially impair First Amendment rights to assemble and petition the government."). In substantial part, the protections against liability imposed by the <u>Noerr-Pennington</u> line of cases flow from the Constitution and from the principle that statutes or other laws that contravene the Constitution in their application are void.

Regardless of whether the term "<u>Noerr-Pennington</u>" applies outside the antitrust context, the protections of the First Amendment surely do. Here, the plaintiffs seek to hold the defendants liable for a conspiracy under the laws of Alabama and Massachusetts. As evidence that the defendants conspired, the plaintiffs invoke concerted

44

action taken in the context of petitioning federal and
state governments and setting industry standards. If, on
the facts of this case, the defendants' actions are
protected by the First Amendment, then no liability may
be imposed by Alabama or Massachusetts law. Although the
specific cases that have developed the Noerr-Pennington
doctrine may not be cases that are binding outside the
context of antitrust legislation, they are apposite and
persuasive authority for determining how the First
Amendment protects "conspiratorial" petitioning activity
that is made the basis of liability by state statute or
state common law.

Accordingly, the court examines the activities in
question. The plaintiffs allege that the defendants
developed RBCA and came together in PIRI to limit their
financial exposure, to squelch the development and
implementation of state-of-the-art technology, and to
obstruct the public from understanding the nature and
extent of UST leaks and contamination. The plaintiffs

45

argue that any lobbying or petitioning activity was merely incidental to the "commercial heart of the activity."[38] The plaintiffs' arguments are not borne out by the evidence they have supplied.[39]

Nonetheless, it is clear that the plaintiffs confuse the fact that the defendants' petitioning activity was intended to reduce their costs and financial exposure with activity that is commercial in nature and only incidentally related to lobbying. Common sense indicates that only rarely will commercial enterprises lobby government for laws or regulations that do not have commercial effects or are not in their commercial interests. Just because such petitioning activity is aimed to protect commercial interests does not make it activity that is not protected under the First Amendment.

---

38. Plaintiffs' consolidated response at 60.

39. Although the plaintiffs have raised this issue as a possible plus factor, the evidence that they have submitted gives little indication of which state or federal regulations or statutes are the objects of their concern.

TEC Cogeneration, 76 F.3d at 1573 (the fact that litigant
had a pecuniary interest in the outcome of the lobbying
does not preclude finding that the activity is protected
by the First Amendment).   Indeed, even petitioning that
is intended to eliminate competition protected by the
antitrust laws--an obviously commercial effect--is
shielded by the First Amendment.  Pennington, 381 U.S. at
670.   Only if petitioning activities, as stated, are
clearly secondary to the commercial activity might the
First Amendment not shield a litigant from liability.
TEC Cogeneration, 76 F.3d at 1572-73.

        Although  in  some  cases  it  may  be  difficult  to
determine whether petitioning activity is protected by
the First Amendment, that dilemma is not presented by
this case.   The evidence clearly and unambiguously
establishes that the defendants' actions in PIRI and in
seeking to have federal and state entities adopt RBCA
remediation standards and approaches were legitimate

**47**

petitioning activities.[40]  No reasonable factfinder could find otherwise.

However, the fact that the petitioning activities are protected does not necessarily answer the question of whether the industry standard-setting activities related to RBCA and PIRI are also protected.  Where private standard-setting associations come together to create industry norms, such activities may not be shielded by the First Amendment, even if such standards are routinely adopted by government agencies.  Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988). However, in this case, unlike Allied Tube, the industry development of RBCA was in conjunction with and incidental to protected petitioning activities.  This case does not present an example of petitioning a private, industry group to set a standard.  This case presents a straightforward effort by individual corporations jointly to develop a standard and then

_____

40.  See, e.g., plaintiffs' exhibits 143, 161, 165, 166, 271, 313, 357, 364, 402, 443.

48

petitioning government entities to adopt it in legislation and regulation.[41]    There is no evidence of which the court is aware that supports the inference that development of RBCA was not "incidental" to the defendants' petitioning activity, see <u>TEC Cogeneration</u>, 76 F.3d at 1572; therefore, the conduct is protected under the First Amendment.

In short, the plaintiffs seek to show that the defendants conspired together by agreeing to develop standards and petitioning state and federal government entities to adopt them.    Such activity is protected by the Constitution and may not be proof of the conspiracy that the plaintiffs allege.

## B.  Expert Opinion of Marcel Moreau

The plaintiffs have submitted the expert opinion of Marcel Moreau as further evidence of the existence of the conspiracy.    Moreau's opinion is 45-pages long and

---

41. Plaintiffs' exhibits 143, 166, 271, 440.

49

extensively rehearses the facts of the alleged conspiracy. Moreau, who is a geologist and an oceanographer by training,[42] has been a consultant on UST issues and has studied European underground storage technologies. The defendants have objected to the admissibility of Moreau's opinions.

The Supreme Court has addressed the use of expert evidence "when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable." Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993); In re Baby Food Antitrust Litigation, 166 F.3d 112, 135 (3rd Cir. 1999). The Court concluded that such expert opinion "cannot support a jury's verdict." Brooke, 509 U.S. at 242. As the Brooke Court explained, "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." Id. at 2598. Here, the bare

---

42. Plaintiffs' Exhibit 317 at ¶ 1.

assertions of Moreau, unsupported by the other evidence
in the case or any other basis, does not provide the
evidence needed to make the existence of an agreement
more likely than not.

Moreau states that his opinions are based on the
documents produced for this litigation and his experience
as a consultant and speaker. His experience, however, as
outlined in his declaration, is not relevant to the
question of concerted action. It provides no additional
or independent evidence to show that the arguably
parallel conduct by the defendants was more likely than
not to have been undertaken jointly; nor does Moreau
claim to have personal knowledge of facts that would tend
to show concerted action. Moreover, insofar as his
declaration is based on evidence produced in this case,
as discussed above, that evidence does not discount the
possibility of independent action by each defendant.

The court cannot, in the words of the Brooke Court,
simply "substitute" the conclusions of Moreau for the

other evidence in this case.    Therefore, viewed through
the lens of  Fed. R. Evid. 702, Moreau's testimony does
not meet the requirements of that evidentiary rule.   See
Fed. R. Evid. 702, advisory committee notes, 2000
amendment ("[I]f the witness is relying solely or
primarily on experience, then the witness must explain
how that experience leads to the conclusion reached, why
that experience is a sufficient basis for the opinion,
and how that experience is reliably applied to the facts.
The trial court's gatekeeping function requires more than
simply taking the expert's word for it.") (internal
citations and quotations omitted).[43]   And viewed through

_____

43. Rule 702 provides:

"If scientific, technical, or other
specialized knowledge will assist the
trier of fact to understand the evidence
or to determine a fact in issue, a
witness qualified as an expert by
knowledge, skill, experience, training,
or education, may testify thereto in the
form of an opinion or otherwise, if (1)
the testimony is based upon sufficient
facts or data, (2) the testimony is the
product of reliable principles and
                                (continued...)

52

the lens of Fed. R. Civ. P. 56, as explained in Part II
of this opinion, Moreau's testimony does not create a
disputed issue of material fact.

* * * *

Discovery in this case has been extensive. The
record filed with the court is considerable. However,
the plaintiffs have not satisfied their burden of coming
forward with evidence that would enable a reasonable
factfinder to conclude that the defendants conspired
together as the plaintiffs have alleged. None of the
evidence suggests that the defendants reached the
agreements that the plaintiffs have alleged; none of the
plus factors that the plaintiffs have raised indicate
that the defendants were not acting in their individual
as opposed to joint interests; and finally, and most

_____

43. (...continued)
    methods, and (3) the witness has applied
    the principles and methods reliably to
    the facts of the case."

tellingly, none of the evidence suggests that the defendants <u>needed</u> to conspire together to act as the plaintiffs have alleged: all of the conduct, with the exception, perhaps, of those activities involved in lobbying the government, could easily be undertaken by each defendant acting alone, without agreement or cooperation with the other defendants. The plaintiffs have been afforded ample opportunity to develop to support their conspiracy theory. They have not done so.

An appropriate judgment will be entered.

DONE, this the 10th day of October, 2006.

<u>   /s/ Myron H. Thompson   </u>
UNITED STATES DISTRICT JUDGE